Simons, J.
(dissenting). The inmate claimants before the court were kept in punitive confinement by correction officials, for 107 and 120 days respectively, on charges of misconduct which were subsequently dismissed. They allege that the charges against them were trumped up, that they were the victims of intentional and malicious wrongs by State employees. The issue before the court is whether, assuming their claims are true, they may recover money damages for the wrongs done them. The majority hold that they may not, that correction officials are absolutely immune from tort liability for such wrongs.
Although I agree that the Hearing Officers are entitled to absolute immunity for common-law torts, I do not agree that the correction officers who investigate inmate misbehavior and institute disciplinary proceeding by preparing and filing misconduct reports are similarly immune. The protection afforded Hearing Officers may be warranted because of the quasi-judicial nature of their duties but there is little to commend a rule of law that insulates the State and its investigative officials from liability for damage caused by deliberate wrongdoing. Nor is there any need to establish absolute immunity in this case for correction officers enjoy the benefits of a unique *222 statute protecting them against personal liability for their wrongs (see, Correction Law §24). In my view, the officers’ actions are comparable to the actions of police officers, who under established law are entitled only to qualified immunity. Accordingly, I dissent and I would reverse the order of the Appellate Division and reinstate the claims seeking to hold the State vicariously liable for the actions of the investigating correction officers.
I
Under traditional legal doctrine, the State is not liable for torts committed in its service by officers or employees unless it consents to such liability. New York waived its sovereign immunity by enacting section 8 of the Court of Claims Act and consented to have its liability determined generally in accordance with the same rules of law that apply against individuals and corporations (see, Jones v State of New York, 33 NY2d 275, rearg dismissed 55 NY2d 878). Nevertheless, not all conduct by public officials is actionable; the State may assert that claims against it are barred because the acts of its servants are immune from suit notwithstanding its waiver of sovereign immunity generally. The defense of immunity is available to public officers and employees charged with making decisions and of acting in accordance with them so that they will not be unduly hampered in the discharge of their duties. It is recognized, as a matter of policy, because the operations of government would be impeded if those who act improperly or exceed the authority given them were not protected in some reasonable degree by being relieved from private liability. The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognized need to preserve independence of action, undeterred by the fear of personal liability and vexatious suits, which could substantially impair the effective performance of a discretionary function.
New York has granted immunity more broadly than most jurisdictions, drawing the line generally between discretionary acts which are immune from suit and ministerial acts, which are not (see, Rottkamp v Young, 15 NY2d 831, 833 [dissenting opn of Burke, J.]). The distinction is an unfortunate one, derived from the old rules governing injunctions and prerogative writs (see, 5 Harper, James and Gray, Torts § 29.10, at 668-669 [2d ed]). Under those rules, the court avoided interfer *223 ing with discretionary acts of the executive branch of government but would entertain proceedings involving ministerial functions of executive officers. That rule has little bearing in tort claims but unfortunately it has been the source of much New York law, oversimplifying the analysis to one of affixing the appropriate label on the officials’ actions rather than examining the factors upon which a sound policy decision can be made. Immunity should be based on such factors as (1) the function the officer is performing, (2) the extent to which review of that judgment will involve the court in passing judgment on a coordinate branch of government, (3) the extent to which judicial review will impair free exercise of discretion, (4) the extent to which ultimate financial responsibility will fall on the officer, (5) the likelihood that harm will result to members of the public if the action is taken, (6) the nature and seriousness of the harm which may result and (7) the availability of other remedies to the injured party (see, Restatement [Second] of Torts § 895D, comment f). Under this analysis, even if the act is considered "discretionary”, and therefore entitled to some protection, the immunity extended may properly be limited as a matter of sound public policy.
An official receiving absolute immunity is not liable to another, regardless of his motives and whether or not he tried to exercise his judgment in good faith, so long as he acts within the general scope of his authority (cf., Della Pietra v State of New York, 71 NY2d 792). Typical is the rule shielding a Judge from liability no matter how erroneously, corruptly, or maliciously he is alleged to have acted (see, Sweeney v O’Dwyer, 197 NY 499, 504; Lange v Benedict, 73 NY 12, 25; Pierson v Ray, 386 US 547; and see, Tarter v State of New York, 68 NY2d 511, 518). The immunity is granted because of the Judge’s neutral position and the need to insure absolute independence injudicial office. We have extended this protection to administrative officials and others performing quasi-judicial duties if they are truly "neutrally positioned government officials” (Tarter v State of New York, 68 NY2d 511, 518, supra).
As our opinion in Tarter made clear, however, not "every official act involving discretion will be considered a judicial function conferring absolute immunity” (id., at 519). Qualified, not absolute, immunity is the norm and the burden rests on the official seeking absolute freedom from liability to demonstrate that public policy requires an exemption of that scope *224 (Cleavinger v Saxner, 474 US 193, 201; Harlow v Fitzgerald, 457 US 800, 807).
The Supreme Court considered what immunity should be afforded prison officials for wrongs arising from disciplinary proceedings in Cleavinger v Saxner (474 US 193, 203-204, supra; see also, Procunier v Navarette, 434 US 555) and held that they were entitled to only qualified immunity in actions seeking damages for violations of an inmate’s constitutional rights. Even in claims against Hearing Officers it found them entitled to no more than limited protection because they are not neutral and independent adjudicatory officers but prison employees temporarily diverted from their regular duties and amenable to prison administrators and staff. Despite this authority I concur with the majority’s conclusion that, for purposes of common-law tort actions in New York, prison Hearing Officers should be entitled to absolute immunity because they perform a function that is adjudicatory in the broad sense of the term and they do so under conditions of extreme intimacy and tension which require that they be insulated from harassment by inmates. I would but add that granting full immunity under State law does not eliminate all avenues of relief because inmates may maintain an action in the Federal courts for the unconstitutional actions of Hearing Officers (see, Cleavinger v Saxner, supra).[1]
The function of the correction officers who investigate and prefer charges differs substantially from those of the Hearing Officers, however, and analysis is not aided by the conclusory assertion that their work also requires the use of discretion. As we noted in Tango v Tulevech, "almost any act admits some discretion in the manner of performance, even driving a nail” (61 NY2d 34, 41, quoting Prosser, Torts § 132, at 990 [4th ed]; and see, Restatement [Second] of Torts § 895D, comment h [ministerial acts — including care of prisoners as a ministerial act]). The task is to identify those functions which the courts are willing to recognize as entitled to the protection afforded by absolute immunity. As the Second Circuit Court of Appeals observed when deciding that police officers who make arrests and conduct searches are not entitled to absolute immunity, "the real question to be asked is whether or not federal *225 officers performing police duties warrant the protection of the [absolute] immunity defense” (Bivens v Six Unknown Named Agents, 456 F2d 1339, 1346). The question is one of policy for while "it is true that a police officer must exercise some discretion in making an arrest, the fiction that this act is not discretionary is maintained because of the belief that the benefit to society derived from the protection of personal liberties outweighs the detriment of perhaps deterring vigorous police action” (id). The Bivens court resolved the policy question against absolute immunity.
New York has treated police officers similarly, even under our broader immunity rules. Our decision in Jones v State of New York (supra) recites State law fully consistent with Bivens. In Jones we held by a divided court that the State could be held liable vicariously for the acts of an agent who intentionally assaulted claimant’s decedent during the effort to retake the Attica Correctional Facility after the 1971 uprising. The two opinions cite extensive authority for the proposition that the State and its municipalities may be held liable for actions of its police officers (see, Jones v State of New York, supra). Indeed the dissent recognized the historical "destruction of immunity for police torts” (id., at 282), but believed that the State was immune because the claim challenged a policy decision of the executive branch of government, how to regain control of the facility after the uprising, not an action by an individual police officer. Observing that it is difficult to define with precision what is a discretionary function for immunity purposes, the dissent noted that it would have found no immunity if Jones were "a simple police tort case” (id., at 286). And this was so notwithstanding the role of discretion, perhaps a high degree of discretion, in effecting an arrest (id., at 285; see, Bivens v Six Unknown Named Agents, 456 F2d 1339, 1346, supra; Jaffe, Suits against Governments and Officers: Damage Actions, 77 Harv L Rev 209, 218-219). Thus, all seven members of the Jones court agreed that if a police officer commits an intentional tort during an arrest situation, similar to the allegations here, the law does not recognize the conduct as a discretionary act entitled to absolute immunity. A majority of the court also applied that rule to officers acting in the explosive setting which surrounded the retaking of Attica Prison.
Thus, these officials who investigate and file disciplinary charges performed a function analogous to police officers making an arrest or conducting a search or in retaking the *226 prison in Jones and they should receive no greater protection than the qualified immunity applicable to police officers under Federal law (see, 42 USC § 1983; Bivens v Six Unknown Fed. Narcotics Agents, 403 US 388; Pierson v Ray, 386 US 547, 555-557) or, in the context of a State tort action for false arrest or othe^ intentional tort, the corresponding defense of privilege, shielding the officer from liability for objectively reasonable but mistaken exercises of judgment (see, Broughton v State of New York, 37 NY2d 451, 457-458; Smith v County of Nassau, 34 NY2d 18, 23-24; see also, Pierson v Ray, 386 US 547, 555-557, supra).[2] Indeed, even if it be urged, as the majority does, that the investigation functions of the correction officers are more analogous to similar functions performed by prosecutorial officials they would be entitled to no more than limited protection (see, Drake v City of Rochester, 96 Misc 2d 86, 100-101, affd 74 AD2d 996; cf., Imbler v Pachtman, 424 US 409).
Nor do I find that the decisions the majority cites support its claim that investigating officers are entitled to absolute immunity. It relies principally on Eiseman v State of New York (70 NY2d 175, 184); Tarter v State of New York (supra) and Tango v Tulevech (supra). Those decisions are distinguishable on two grounds: first because they involve attempts to hold officers liable for quasi-judicial acts and under established law the investigation and arrest of offenders by the police are not quasi-judicial acts and second, because they were negligence claims not claims for intentional tort as alleged here. Moreover, the "need”, in the policy sense, for immunity was greater in those cases because the officials did not take the direct action which caused the plaintiffs’ injuries themselves; they created only a risk of harm. The actual injury was caused by a third party. In effect, the doctrine of immunity was used to define the scope of duty owed to members of the general public (see, Crosland v New York City Tr. Auth., 68 NY2d 165, 170; see, Prosser and Keeton, Torts § 132, at 1062-1063 [5th ed]). Moreover, the majority’s reliance on Schanbarger v Kellogg (35 AD2d 902, appeal dismissed 29 NY2d 649, lv denied 29 NY2d 485, cert denied 405 US 919) is erroneous, for in Schanbarger the police officer making the initial arrest was held liable for the tort of false imprisonment (Schanbarger v Kellogg, 37 NY2d 451, cert denied 423 US 929).
*227 The majority finds that "the problems of maintaining security and discipline within correctional facilities” (majority opn, at 218) requires affording all correction personnel absolute immunity. Correction officials undoubtedly confront unique problems but several reasons indicate that qualified immunity or the common-law defense of privilege provides the desired balance, permitting prison officials to perform their tasks effectively and recognizing the right of inmates to be free from harm maliciously inflicted by prison personnel.
First, misconduct by prison officials presents a potential for harm which may not be deterred or subject to redress unless inmates have a common-law remedy. This is so because prison disciplinary proceedings may be commenced with the filing of an inmate misbehavior report any time an employee suspects but is not reasonably sure that an inmate was involved in an incident (7 NYCRR 251-1.4 [d]). A correction officer may place an inmate in punitive confinement when the officer has reasonable grounds to believe that there is an immediate threat to the safety, or order of the facility or in an immediate danger to other persons or to property (7 NYCRR 251-1.6). Thus, inmates may be confined for 14 days, or longer upon approval of the Commissioner’s designee, on the sole authority of the officer preparing the misbehavior report before guilt or innocence is resolved or before any judicial or quasi-judicial assessment of its validity is made. These powers may easily be abused with little risk of public scrutiny because, unlike police stations and courtrooms, the public and press have little access to prisons.
Second, inmates have no adequate remedy other than an action for damages. Notwithstanding the majority’s statements about liability generally, its holding results in barring these claimants from relief in both State and Federal courts and the majority does not claim otherwise. Correction Law § 24 (1) prevents an inmate from suing a correction officer in his personal capacity in State court for either State common-law or constitutional violations (see, Cepeda v Coughlin, 128 AD2d 995, lv denied 70 NY2d 602). But more importantly, a recent ruling of the Second Circuit Court of Appeals holds that an inmate has no constitutional claim for being falsely or wrongly accused of conduct that has resulted in a deprivation of a constitutionally protected liberty interest by being placed in a special housing unit or solitary confinement provided the inmate is afforded with the minimum requirements of due *228 process required for prison disciplinary matters (Freeman v Rideout, 808 F2d 949). Thus, inmates such as these, who do not claim that they have been denied procedural due process but allege that they have been wrongfully and maliciously placed in punitive confinement, have no forum, either State or Federal, to seek money damages to redress the wrong. That we may disagree with the Second Circuit is little comfort to New York prisoners. Under current law, we will never be able to address the question because Correction Law §24 (1) prevents an inmate from bringing a section 1983 action against a correction officer in State court.
Moreover, the majority’s ruling is not necessary to achieve the underlying purpose of the official immunity doctrine. These prison officials will not be exposed to financial liability, even if qualified immunity is the rule, because Correction Law § 24 (1) provides them with even greater protection than other public officials receive. It does more than indemnify the official against personal liability; it forecloses inmate suits against the officers completely (cf., Public Officers Law §§ 17, 18). At best, the action could be maintained against the State for vicarious liability and now the majority has foreclosed even that avenue of relief.
The majority contends that notwithstanding the lack of a tort remedy, administrative review and article 78 relief inhibit unlawful and malicious actions by prison officials. These remedies offer no realistic deterrent to correction officers acting in bad faith, however, and little solace to inmates who have already served their sentence in special housing. The officer may still confine inmates until resolution of the pending charges and even if the charges are dismissed by the prison Hearing Officer or the courts, the inmate is the worse for the experience, not the correction officer.
In sum, and applying the criteria listed above (dissenting opn, at 222), the correction officers are performing what is essentially a police function, one which the courts routinely review, and the availability of relief against the State will not inhibit them in the performance of those duties or result in financial risk because of statutory protection afforded to them. But most important the absence of a remedy, under these circumstances which permit extraordinary opportunities for abuse because of the broad powers given the officers and the lack of public oversight mandate that some remedy be available to these claimants and others similarly situated and the *229 majority’s decision ensures that none is. The common-law doctrine of privilege, which is the functional equivalent of qualified immunity as used in Federal decisions (Pierson v Ray, 386 US 547, 555, supra; Prosser and Keeton, Torts § 131, at 1032 [5th ed]; Restatement [Second] of Torts § 895D, comment e) adequately protects the State’s interest without foreclosing all avenues of relief for wrongful confinement and it should be available here. Applying that doctrine to the cases before us, claimants have stated a cause of action and their claims should not have been dismissed.
II
On this appeal claimants have confined their arguments to the causes of action alleging malicious prosecution and false imprisonment.
Whether an administrative hearing is a "judicial proceeding”, and therefore will support a cause of action for malicious prosecution, appears to be an open question in this court although other courts have considered the subject (see, e.g., Groat v Town Bd., 73 AD2d 426, and cases cited therein; Gittens v State of New York, 132 Misc 2d 399; Treacy v State of New York, 131 Misc 2d 849). The question need not be resolved in this dissenting opinion, however, for claimants have stated a valid cause of action in the nature of false imprisonment or, as one court has termed it in the prison context, "wrongful excessive confinement” (see, Gittens v State of New York, supra, at 407). For that reason, if no other, their claims should not have been dismissed.
Claimants have alleged that the State intended to confine them, that they were conscious of the confinement and did not consent to it and that the confinement was not privileged. Those allegations sufficiently plead a claim for damages arising from false imprisonment (Broughton v State of New York, 37 NY2d 451, supra, citing Restatement [Second] of Torts § 35). The only element of the cause of action in doubt is the element of privilege. The majority’s analysis implicitly concludes that a correction officer’s actions in confining an inmate to a special housing unit is privileged simply because the party bringing suit is an inmate, an individual whose freedom of movement is already restrained to a significant degree, and because the State provides procedural due process to the inmates. An inmate has a constitutionally protected liberty interest to remain in the general prison population, however, *230 by virtue of New York’s statutes and regulations (see, Deane v Dunbar, 777 F2d 871) and even though this may not be actionable in a 1983 action in Federal court, inmates should have a common-law remedy to protect this liberty interest (compare, Freeman v Rideout, 808 F2d 949, supra, with opns of Oakes and Newman, JJ., dissenting from denial of petition for rehearing en banc 826 F2d 194). Claimants have alleged that they were intentionally and maliciously placed in punitive segregation for no legitimate reason. We held years ago, in Wilkinson v Skinner (34 NY2d 53), that such allegations state a cause of action which if proved will entitle an inmate to recover damages attributable to the segregation but the majority neither distinguishes nor expressly overrules that decision.
I perceive no policy reasons why such a remedy should be foreclosed. Certainly, requiring the courts to pass on the merits of an inmate’s claim of wrongful punitive confinement will not impose a crushing burden upon the State, nor should it inhibit prison officials in the proper performance of their duties. Public officials currently enjoy complete freedom from personal liability for acts performed in the performance of their duties (Correction Law § 24 [1]; Cepeda v Coughlin, 128 AD2d 995, supra) and the rule of qualified immunity, insulating the State from liability for the reasonable acts of correction officials performed in the exercise of their duties provides the State with ample protection.
Accordingly, I dissent.
Judges Kaye, Alexander and Titone concur with Judge Hancock, Jr.; Judge Simons dissents and votes to reverse in a separate opinion in which Chief Judge Wachtler and Judge Bellacosa concur.
Order affirmed, without costs.

. The same would not be true for an action against the investigative officers under the facts in these cases because under the law existing in the Second Circuit the investigative officials did not deprive claimants of their constitutional due process rights (see, Freeman v Rideout, 808 F2d 949, reh denied 826 F2d 194, cert denied — US —, 108 S Ct 1273).

. For a general discussion of immunity and privilege and the confusion in terms in this area, see, Restatement (Second) of Torts § 895D, comment e; Prosser and Keeton, Torts §§ 131, 132, at 1032-1033, 1043-1051, 1056-1069 (5th ed).